IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

JOSE LUIS RIVERA-CARTAGENA, *et al.*,

    **Plaintiffs,**

          **v.**                   **CIVIL NO.** 09-1787 (FAB)

WAL-MART PUERTO RICO, INC., *et al.*,

    **Defendants.**

**OPINION & ORDER[1]**

BESOSA, District Judge

    Defendants have filed a motion for summary judgment. (Docket No. 109.)  Having considered the arguments contained in defendants' motion, plaintiffs' opposition, defendants' reply, and plaintiff's surreply, (Docket Nos. 120, 144 & 167), the Court **GRANTS** the motion for summary judgment.

**DISCUSSION**

**I.   BACKGROUND**

    **A.   Procedural Background**

        On February 8, 2010, plaintiffs Jose Luis Rivera-Cartagena ("Rivera"), his wife Ivanesa Velez ("Velez") and their conjugal partnership, filed a second amended complaint

---

[1] Myrgia Palacios, a fourth-year student at Interamerican University Law School, assisted in the preparation of this Opinion and Order.

("complaint") against Wal-Mart Puerto Rico Inc. ("Wal-Mart") and Eriee Gibson ("Gibson").  (Docket No. 30.)  The complaint alleges claims pursuant to:  (1) the Uniformed Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. §§ 4301-4335; (2) Law 62 of the Commonwealth of Puerto Rico ("Law 62"), P.R. Laws Ann. tit. 25, §§ 2001-2813; (3) Law 80 of the Commonwealth of Puerto Rico ("Law 80"), P.R. Laws Ann. tit. 29, §§ 185a-185m; (4) articles 1802 and 1803 of the Puerto Rico Civil Code ("articles 1802 and 1803"), P.R. Laws Ann. tit. 31, §§ 5141-5142; and (5) Article II of the Puerto Rico Constitution ("P.R. Constitution").

On April 19, 2010, Wal-Mart filed a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), (Docket No. 40), arguing:  (1) that Rivera's claims under articles 1802 and 1803 should be dismissed because they hinge upon the same facts as his Law 62 claim; (2) that Velez's and the conjugal partnership's claims under articles 1802 and 1803 should be dismissed because they are not entitled to bring a separate cause of action arising from the same set of facts; (3) that plaintiffs' claims under the P.R. Constitution should be dismissed because the complaint is insufficient to state a claim upon which relief may be granted; and (4) that some of Rivera's claims under Law 62 are time-barred.

Plaintiffs filed their opposition on May 25, 2010, (Docket No. 47), arguing: (1) that Velez's and the conjugal partnership's claims under articles 1802 and 1803 should not be dismissed because, as relatives of Rivera, they are entitled to an independent claim; and (2) that plaintiffs' claims under the P.R. Constitution are sufficient to state a claim. Nevertheless, plaintiffs conceded: (1) that Rivera's claims under articles 1802 and 1803 hinged upon the same facts; and (2) that the causes of action under Law 62, which are based on events occurring prior to February 10, 2009, are time-barred. Id. Plaintiffs moved for voluntary dismissal on these causes of action and the Court dismissed them with prejudice on May 25, 2010. (Docket No. 48.)

On June 15, 2010, Gibson also filed a motion to dismiss pursuant to Rule 12(b)(6). (Docket No. 51.) He argued: (1) that Rivera lacks a cause of action against him under Law 80, Law 62 and USERRA because he is not an "employer"; (2) that Velez and the conjugal partnership are not entitled to bring separate causes of action, arising from the same set of facts, under articles 1802 and 1803; and (3) that plaintiffs fail to state a claim under the P.R. Constitution.

Plaintiffs filed their opposition to Gibson's motion on July 22, 2010 (Docket No. 54), and argued: (1) that his USERRA claims against Gibson should not be dismissed because allegations

in the complaint are sufficient to state a claim; (2) that Velez's and the conjugal partnership's claims under articles 1802 and 1803 should not be dismissed because, as relatives of Rivera, they are entitled to independent claims; and (3) that plaintiffs' claims under the P.R. Constitution are sufficient to state a claim. Gibson filed a reply, sustaining the same arguments as to: (1) Rivera's claims under USERRA; (2) Velez's and the conjugal partnership's claims under articles 1802 and 1803; and (3) plaintiffs' claims under the P.R. Constitution. (Docket No. 61.)

In plaintiffs' opposition to Gibson's motion to dismiss, plaintiffs conceded that Gibson does not fit the definition of "employer" under Law 80 or Law 62. (Docket No. 54.) They moved for voluntary dismissal on these causes of action and the Court dismissed them with prejudice on July 22, 2010. (Docket No. 55.)

After plaintiffs' motions for voluntary dismissal were granted, only some of the arguments advanced by defendants remained pending. As to Wal-Mart, those arguments related to: (1) Velez's and the conjugal partnership's claims for damages under articles 1802 and 1803; and (2) plaintiffs' claim under the P.R. Constitution. (Docket No. 40.) Regarding Gibson, the remaining arguments concerned: (1) Rivera's claim under USERRA; (2) Velez's and the conjugal partnership's claims for damages under articles

1802 and 1803; and (3) plaintiffs' claim under the P.R. Constitution.  (Docket No. 51.)

On November 22, 2010, defendants filed a motion for summary judgment.  (Docket Nos. 109 & 110.)  In that motion, defendants argue:  (1) that plaintiff Rivera cannot prevail on his discrimination claims under USERRA and Law 62 because he cannot establish that his military status was a motivating factor in any on the actions taken by Wal-Mart with respect to his employment; (2) that plaintiff Rivera cannot prevail in his Law 80 claim because his termination was justified; (3) that plaintiffs lack a cause of action for damages under articles 1802 and 1803 because the damages claimed are based on the same facts that form the basis of plaintiffs' military discrimination claim; and (4) that plaintiffs lack a cause of action under the P.R. Constitution because no state action is involved and because plaintiffs have failed to allege independent facts that could constitute a colorable constitutional claim.

On December 28, 2010, plaintiffs filed an opposition to the motion for summary judgment.  (Docket Nos. 118, 119 & 120.)  In their opposition, plaintiffs argue:  (1) that defendants discriminated against Rivera in violation of Law 62 and USERRA; and (2) that Rivera has a cause of action under Law 80 because he was unjustly terminated.  The opposition does not address plaintiffs'

cause of action under articles 1802 and 1803 or plaintiff Rivera's cause of action under the P.R. Constitution.  On January 21, 2011, defendants filed a reply to plaintiffs' opposition to the motion for summary judgment, (Docket No. 144), and on February 8, 2011, plaintiffs filed a surreply.  (Docket No. 167.)

On March 4, 2011, the Court granted Gibson's motion to dismiss, (Docket No. 51), and dismissed with prejudice all claims against him.  The Court also granted in part and denied in part Wal-Mart's motion to dismiss, (Docket No. 40), and dismissed with prejudice Velez's and the conjugal partnership's claims for damages under articles 1802 and 1803 of the Puerto Rico Civil Code, and under the P.R. Constitution.  The Court also dismissed all claims against unnamed defendants.  (Docket No. 175.)  Thus, the remaining causes of action at this stage are Rivera's claims against Wal-Mart:  (1) under USERRA; (2) under Law 62, only as to claims based on events occurring after February 10, 2009; (3) under Law 80; and (4) under the P.R. Constitution.

### B.   Uncontested Facts[2]

#### 1.   Rivera's employment at Wal-Mart

Rivera began working in Supermercados Amigo ("Amigo") in Lomas Verdes, Bayamon, as a bagger, on March 28, 1988. (Docket No. 109-1 ¶ 1; Docket No. 120 ¶ 1; Docket No. 120 at 30 ¶ 1; Docket No. 144-1 ¶ 1.)  Through his hard work, self discipline and commitment to his employer and his job, Rivera worked up the ladder to positions with higher pay and responsibilities.  (Docket No. 120 at 30 ¶ 2; Docket No. 144-1 ¶ 2; Docket No. 120-25 ¶ (c).) In July 1988, Rivera was promoted to the position of part-time head cashier trainee and then, in October 1988, he was given the position of part-time head cashier.  In 1989, Rivera participated

---

[2]    Having reviewed plaintiffs' opposition to defendants' statements of uncontested facts, the Court finds that almost all of plaintiffs' responses to defendants' assertions of fact do not specifically address those assertions.  (See Docket No. 120.)  They are more properly characterized as additional facts and should have been placed in a separate section pursuant to Local Rule 56(c). Accordingly, those additional facts will not be considered by the Court.  See Caban Hernandez v. Phillip Morris USA, Inc., 486 F.3d 1, 7 (1st Cir. 2007) (holding that "litigants ignore [local rules governing summary judgment proceedings] at their peril.")

Where a party does not act in compliance with Local Rule 56(c), "a district court is free, in the exercise of its sound discretion, to accept the moving party's facts as stated." Rios Jimenez v. Principi, 520 F.3d 31, 38 (1st Cir. 2008) (citing Cosme Rosado v. Serrano Rodriguez, 360 F.3d 42, 45 (1st Cir. 2004)).  If a non-moving party does not admit, deny, or qualify the moving party's assertions of fact as required by Local Rule 56(c), but instead, files an "alternate statement of facts in narrative form," a district court is justified in deeming the moving party's assertions of fact admitted.  Caban Hernandez, 486 F.3d at 7-8.

in the Manager Trainee Program and in 1990, was promoted to the position of Front-End Manager.   In 1992, Rivera was given the position of Interim Assistant Manager and in 1993, was promoted to Assistant Manager.   (Docket No. 120 at 30 ¶ 3; Docket No. 144-1 ¶ 3; Docket No. 120-25 ¶ (d).)   In 2002 and while Hector Rodriguez was Director of Operations, Rivera was again promoted, this time to the position of Store Manager.   (Docket No. 109-1 ¶ 3; Docket No. 120 ¶ 3; Docket No. 146-2 at 213; Docket No. 120 at 30 ¶ 3; Docket No. 144-1 ¶ 3.)   In order to become a Store Manager, a candidate must apply for the position, meet the position requirements, and participate in an interview process.   (Docket No. 120 at 32 ¶ 12; Docket No. 144-1 ¶ 12.)   To obtain the position, the applicant must compete with other qualified candidates.   (Docket No. 120 at 32 ¶ 13; Docket No. 144-1 ¶ 13.)

As Store Manager, Rivera was an exempt employee and set his own work schedules, as well as those of the store's employees.   (Docket No. 109-1 ¶ 4; Docket No. 120 ¶ 4.)   In around 2003, Wal-Mart bought Amigo and Rivera became a Wal-Mart employee. (Docket No. 109-1 ¶ 5; Docket No. 120 ¶ 5; Docket No. 120 at 32 ¶ 10; Docket No. 144-1 ¶ 10.)   When Wal-Mart bought Amigo, Rivera was the Manager of the Amigo store at Monserrate Avenue in Carolina, Puerto Rico.   (Docket No. 120 at 32 ¶ 11; Docket No. 144-1 ¶ 11.)   By 2004, as Manager of the Monserrate Avenue store,

Rivera actively participated in the remodeling of the store. After he worked a daily 10 hour shift, he had to return to the store at night because the managerial staff of the night shift only spoke English and the person in charge of the store at night did not speak English. (Docket No. 120 at 32 ¶ 16; Docket No. 144-1 ¶ 16.)

From October 2007 until June 2009, District Manager Carlos Matos ("Matos") was Rivera's immediate supervisor. (Docket No. 109-1 ¶ 8; Docket No. 120 ¶ 8.) Later, in or about the month of June 2009, District Manager Gibson became Rivera's supervisor. (Docket No. 120 at 37 ¶ 48; Docket No. 144-1 ¶ 48.) At the time of his termination in July 2009, Rivera was the Store Manager for the Amigo store located in Central Plaza, Gibson was still his immediate supervisor and Hector Rodriguez was the Director of Operations. (Docket No. 109-1 ¶¶ 2, 7; Docket No. 120 ¶¶ 2, 7.)

Rivera's participation in the trainings related to his membership in the Puerto Rico National Guard did not by any means affect his performance as an employee. (Docket No. 120 at 31 ¶ 5; Docket No. 144-1 ¶ 5; Docket No. 120-25 ¶ (f).) Rivera's performance review for 2006 was rated "Above Target" with a score of 4.0 out of a maximum 5.0. In 2008, he received an score of 3.57, out of a maximum of 5.0, the best of all the managers in his district. In 2009, he rated "On Target" with a score of 3.56, out of a maximum of 5.0. (Docket No. 120 at 31 ¶ 6; Docket No. 144-1

¶ 6; Docket No. 120-25 ¶ (g); Docket No. 121-9; Docket No. 121-10.)
For 2008, while Wal-Mart's goal for the Associates Opinion Survey
(AOS) was 68% during the year 2008, the store that Rivera managed
obtained 89%, which was among the highest of all stores. (Docket
No. 120 at 31 ¶ 7; Docket No. 144-1 ¶ 7.)

### 2.  **Wal-Mart's Alcohol and Drug Abuse Policy**

Wal-Mart's Employee Handbook provides that the "use,
possession of an open container, personal sale, transfer or
acceptance of alcohol within Wal-Mart property or while attending
Company matters is strictly prohibited".  It also provides that
"[a]ny violation to this policy shall cause immediate termination
. . . ".  (Docket No. 109-1 ¶ 11; Docket No. 120 ¶ 11; Docket
No. 146-9; Docket No. 146-2 at 184.)  Wal-Mart's Alcohol and Drug
Abuse Policy also prohibits associates "from showing up to work
under the influence of alcohol . . . and/or consuming alcohol or
controlled substances during their scheduled work shift, including
rest and meal periods."  The policy provides that "[a]ny violation
to this policy will be motive [for] immediate termination . . . ".
(Docket No. 109-1 ¶ 13; Docket No. 120 ¶ 13; Docket No. 146-9 at 1;
Docket No. 146-10 at 15-16.)

Wal-Mart's Alcohol and Drug Abuse Policy applies
both to hourly and exempt employees, including managers. (Docket
No. 109-1 ¶ 14; Docket No. 120 ¶ 14; Docket No. 146-9 at 1-2;

Docket No. 146-2 at 180.)   Rivera had knowledge of Wal-Mart's
Employee Handbook and of Wal-Mart's Alcohol and Drug Abuse Policy.
(Docket No. 109-1 ¶¶ 12, 15; Docket No. 120 ¶¶ 12, 15; Docket
No. 146-2 at 180.)   Rivera was aware that a violation to the
Company's Alcohol and Drug Abuse Policy would lead to immediate
termination.   (Docket No. 109-1 ¶ 16; Docket No. 120 ¶ 16; Docket
No. 146-2 at 186.)   As a manager, Rivera was called upon to insure
that those employees who reported to him complied with Wal-Mart's
Alcohol and Drug Abuse Policy.   (Docket No. 109-1 ¶ 17; Docket
No. 120 ¶ 17; Docket No. 146-2 at 186.)

       3.    **The Bin Locator Training**

            On June 17, 2009, District Manager Olga Ramos sent
an e-mail to all Amigo stores indicating that on July 8, 2009, they
would be conducting the first Bin Locator Training for managers at
the Ponce Supercenter.   (Docket No. 109-1 ¶ 18; Docket No. 120
¶ 18;  Docket No. 146-11.)   On that same date, Gibson sent an e-
mail to Rivera and other Store Managers in his District notifying
them that the Bin Locator Training was tentatively scheduled for
July 8, 2009 at the Ponce Supercenter.   (Docket No. 109-1 ¶ 19;
Docket No. 120 ¶ 19; Docket No. 146-12; Docket No. 146-5 at 32.)
On July 2, 2009, Gibson sent another e-mail to Rivera and other
Store Managers in his District confirming that the Bin Locator
Training would be held on July 8, 2009 at the Ponce Supercenter.

That e-mail stated that they would all go to the training together as a team in a Company van and that in the afternoon they would have a District Meeting. (Docket No. 109-1 ¶ 20; Docket No. 120 ¶ 20; Docket No. 146-13; Docket No. 146-2 at 190-191.) The District Meeting was going to be held in the Amigo Store in Paseos. (Docket No. 109-1 ¶ 21; Docket No. 120 ¶ 21; Docket No. 146-4 at 58.)

On July 8, 2009, Rivera attended the Bin Locator Training for Amigo Store Managers in the Wal-Mart Supercenter in Ponce. (Docket No. 109-1 ¶ 22; Docket No. 120 ¶ 22.) Gibson picked up the Store Managers, including Rivera, in a company van, and drove them to Ponce to attend the training. Gibson picked up those Store Managers from the Eastern part of the Island in Rio Grande and those employees from the Metropolitan area at the Amigo located in Paseos. (Docket No. 109-1 ¶ 26; Docket No. 120 ¶ 26.) At no time prior to the Bin Locator Training did Rivera inform Gibson that he could not attend the training. (Docket No. 109-1 ¶ 27; Docket No. 120 ¶ 27; Docket No. 146-2 at 195; Docket No. 146-5 at 37.) Rivera was wearing Wal-Mart's uniform the day of the training. (Docket No. 109-1 ¶ 28; Docket No. 120 ¶ 28; Docket No. 146-2 at 189-190; Docket No. 146-4 at 110.)

    **4.   Lunch at "El Cuñao"**

        After the training in the Wal-Mart Supercenter in Ponce, Gibson drove the Store Managers to lunch, in the company van, to "El Cuñao" Restaurant in Cayey. (Docket No. 109-1 ¶ 29; Docket No. 120 ¶ 29; Docket No. 146-5 at 40-41; Docket No. 120 at 37 ¶ 50; Docket No. 144-1 ¶ 50.)  When Rivera arrived at "El Cuñao", he was feeling dizzy as a result of the curvy roads. (Docket No. 120 at 37 ¶ 51; Docket No. 144-1 ¶ 51.)  After eating lunch, Rivera ordered and drank a Cointreau. (Docket No. 109-1 ¶ 30; Docket No. 120 ¶ 30; Docket No. 146-5 at 49; Docket No. 146-2 at 187, 198, 203; Docket No. 120 at 38 ¶ 53; Docket No. 144-1 ¶ 53.)  Gibson saw Rivera holding and drinking from a crystal glass with a clear liquid. (Docket No. 109-1 ¶ 31; Docket No. 120 ¶ 31; Docket No. 146-5 at 49-50.)  Gibson got up and asked the waiter what he had served Rivera. (Docket No. 109-1 ¶ 32; Docket No. 120 ¶ 32; Docket No. 146-4 at 51.)  Gibson informed Rivera that while he would pay for the lunch for the entire group, he would not pay for the Cointreau he had ordered. (Docket No. 109-1 ¶ 33; Docket No. 120 ¶ 33; Docket No. 146-14.)  Rivera took out the money and extended it to Gibson so that he would pay for the Cointreau, but Gibson told him he could not accept the money and that he should pay for it himself. (Docket No. 109-1 ¶ 34; Docket No. 120 ¶ 34; Docket No. 146-2 at 199; Docket No. 146-14.)  The District Meeting

that was planned for the afternoon was held in the van on the way
from Cayey to Paseos.  (Docket No. 109-1 ¶ 35; Docket No. 120 ¶¶
21, 35; Docket No. 146-4 at 58-60, 86-87; Docket No. 146-2 at 199,
204-206; Docket No. 146-15.)

        5.   **Rivera's suspension**

             After lunch at "El Cuñao" and the District Meeting,
Gibson dropped the managers off at the two locations where he had
picked them up, and called Hector Rodriguez and informed him of the
situation with Rivera and the Cointreau.  (Docket No. 109-1 ¶ 36;
Docket No. 120 ¶ 36; Docket No. 146-4 at 61-62; Docket No. 146-6
at 56.)  Gibson also informed the situation to Janary Rodriguez
from Human Resources, who in turn informed the Associates Relations
Director in Human Resources, Rosana Melendez, in order to determine
what steps to follow.  (Docket No. 109-1 ¶ 38; Docket No. 120 ¶ 38;
Docket No. 146-4 at 65-66, 71; Docket No. 146-10 at 7, 15-16.)

             The next day, on July 9, 2009, Gibson met with
Janary Rodriguez and Rosana Melendez.  (Docket No. 109-1 ¶ 39;
Docket No. 120 ¶ 39; Docket No. 146-4 at 66.)  Human Resources
determined that they would carry out an investigation and
recommended that Rivera be suspended from employment pending the
investigation. (Docket No. 109-1 ¶ 40; Docket No. 120 ¶ 40; Docket
No. 146-4 at 67, 69, 72; Docket No. 146-2 at 204-207.)  Hector
Rodriguez was not involved in the decision to suspend Rivera.

(Docket No. 109-1 ¶ 41; Docket No. 120 ¶ 41; Docket No. 146-4 at 78-79.)

On that same date, Gibson and Janary Rodriguez also met with Rivera regarding the Cointreau incident. (Docket No. 109-1 ¶ 42; Docket No. 120 ¶ 42; Docket No. 146-2 at 204-205; Docket No. 146-10 at 18; Docket No. 146-4 at 74; Docket No. 146-15.) During that meeting, Rivera admitted he drank the Cointreau the day before, but alleged that he did so because of health reasons. Rivera indicated that he had diabetes and high cholesterol and that the Cointreau helped to control his upset stomach.[3] Rivera did not submit any document from a doctor recommending that he drink Cointreau for medical purposes. (Docket No. 109-1 ¶ 43; Docket No. 120 ¶ 43; Docket No. 146-2 at 230-232; Docket No. 146-15; Docket No. 146-16.) Janary Rodriguez wrote down a statement with the information provided by Rivera during the meeting. Rivera signed the statement. (Docket No. 109-1 ¶ 42; Docket No. 120 ¶ 42; Docket No. 146-2 at 204-205; Docket No. 146-10 at 18; Docket No. 146-4 at 74; Docket No. 146-15.) Rivera was then suspended

---

[3] Although Cointreau has been said to be a "digestif", served at the end of meals to aid digestion, modern medicine discredits this supposed aid.
See http://en.wikipedia.org/wiki/Digestif. Cointreau is 40% alcohol by volume (80 proof), id. Its sugar content is 24g. per 10 cl, see http://www.cointreau.com/faq-25.html#header, which does not make it appropriate to settle the stomach of a person with diabetes.

from employment, pending an investigation. (Docket No. 109-1 ¶ 44;
Docket No. 120 ¶ 44; Docket No. 146-2 at 205.)  As part of the
investigation, Gibson, David Lopez and Johanna Martinez were
interviewed and Human Resources prepared a narrative based on what
they said.  Each of them signed their statements.  (Docket No. 109-
1 ¶ 45; Docket No. 120 ¶ 45; Docket No. 146-4 at 68-69; Docket No.
146-14; Docket No. 146-17.)

### 6.   Rivera's termination

On July 10, 2009, Rosana Melendez, Gibson, Adaliz
Morales, Hector Rodriguez, Janary Rodriguez and Maria Betancourt,
Wal-Mart's in-house counsel at the time, met to discuss the results
of the investigation and what action to take.  Jorge Hernandez,
Senior Director of Operations, also participated *via* telephone.
(Docket No. 109-1 ¶ 46; Docket No. 120 ¶ 46; Docket No. 146-4
at 77-78, 80-81; Docket No. 146-6 at 65-66.)  During that meeting,
prior cases of alcohol-related violations to the Alcohol and Drug
Abuse Policy were discussed.  (Docket No. 109-1 ¶ 48; Docket
No. 120 ¶ 48; Docket No. 146-4 at 94-95, 104-106.)  Hector
Rodriguez brought up other alternatives aside from termination,
such as transferring Rivera to another store and having him issue
an apology to the Store Managers that were present at the lunch.
(Docket No. 109-1 ¶ 49; Docket No. 120 ¶ 49; Docket No. 146-4
at 104-106; Docket No. 146-6 at 67-68; Docket No. 146-10 at 34.)

Those alternatives were not implemented.  (Docket No. 109-1 ¶ 50;
Docket No. 120 ¶ 50; Docket No. 146-4 at 117-119; Docket No. 146-6
at 67-68; Docket No. 146-10 at 32.)  Rivera was then terminated on
July 10, 2009.  (Docket No. 109-1 ¶ 51; Docket No. 120 ¶ 51; Docket
No. 146-18.)

### 7.  Disciplinary measures taken by Wal-Mart in other cases

H.V., an hourly associate in Mayagüez, was
terminated on June 3, 2009 for drinking beer during work hours, in
violation of the Alcohol and Drug Abuse Policy.[4]  (Docket No. 109-1
¶ 53; Docket No. 120 ¶ 53; Docket No. 109-23 at 6 ¶ 25.)

E.R., Assistant Manager of Amigo in Luquillo, was
terminated on April 16, 2007 for showing up to work visibly under
the effects of alcohol, in violation of the Alcohol and Drug Abuse
Policy.  (Docket No. 109-1 ¶ 54; Docket No. 120 ¶ 54; Docket No.
109-23 at 6 ¶ 25.)

F.G., an hourly associate from the Amigo store in
Salinas, was terminated on July 16, 2008, for drinking beer during
a lunch stop on his way to work from a work-related training, in

---

[4] In the course of discovery, defendants produced certain
confidential documents related to Wal-Mart employees who are not
parties to this case.  (See Docket Nos. 44 & 112.)  In order to
protect the confidentiality of those documents, the names of those
employees will be replaced by their initials in this Opinion and
Order.

violation of the Alcohol and Drug Abuse Policy.  (Docket No. 109-1
¶ 55; Docket No. 120 ¶ 55; Docket No. 109-23 at 7 ¶ 25.)

        J.P., an hourly associate who worked at the Sam's
store in Carolina, was terminated on November 30, 2005 for drinking
an alcoholic drink ("coquito") during work hours, in violation of
the Alcohol and Drug Abuse Policy.  (Docket No. 109-1 ¶ 56; Docket
No. 120 ¶ 56; Docket No. 109-23 at 7 ¶ 25.)

        G.I., an associate who worked at the Sam's store in
Carolina, was terminated in November 2005 for drinking an alcoholic
drink ("coquito") during work hours, in violation of the Alcohol
and Drug Abuse Policy.  (Docket No. 109-1 ¶ 57; Docket No. 120 ¶
57; Docket No. 109-23 at 7 ¶ 25.)

        M.R., a supervisor at Sam's in Carolina, was on her
day off when she went to Sam's tire shop.  While there, she was
offered a glass of "coquito" by an associate.  M.R., who was
pregnant at the time, asked for confirmation that the "coquito" did
not contain alcohol.  She did not receive confirmation either way,
assumed it did not have alcohol, and tried a sip of the "coquito".
At that point, she realized it had alcohol and did not continue to
drink it.  M.R. was not terminated because she was not on duty at
the time of the incident and because she stated that had she known
it contained alcohol, she would not have drunk it.  This statement
was credible in light of the fact that M.R. was pregnant for the

first time and had difficulty getting pregnant in the past.  M.R. was demoted, however, as a result of this incident.  (Docket No. 109-1 ¶ 58; Docket No. 120 ¶ 58; Docket No. 109-23 at 7 ¶ 25.)

S.R., who worked at Amigo Guaynabo, went to work during a night shift.  While at work, she mentioned to a co-worker that she had one or two beers prior to going to work.  No one saw her drinking and she was not visibly affected by the alcohol. Because of the time of day, she could not be sent to be tested for alcohol in her blood and instead was sent home.  She was not terminated, because Wal-Mart could not determine whether she had violated the Alcohol and Drug Abuse Policy or whether she was under the influence of alcohol while at work.  (Docket No. 109-1 ¶ 59; Docket No. 120 ¶ 59; Docket No. 146-10 at 23; Docket No. 109-23 at 7-8 ¶ 25.)

In 2007, Human Resources investigated an incident involving Loss Prevention Manager E.V., for something that occurred during Wal-Mart's Shareholders' Meeting in Bentonville, Arkansas. (Docket No. 109-1 ¶ 60; Docket No. 120 ¶ 60; Docket No. 146-19 at 21-29; Docket No. 120-11; Docket No. 146-20.)  The Shareholders Meeting is a week-long activity. When the meetings during the day conclude, associates attending the event are free to do whatever they want with their time.  (Docket No. 109-1 ¶ 61; Docket No. 120 ¶ 61; Docket No. 146-19 at 24.)   The incident investigated

concerned some employees that, while socializing, drank alcoholic beverages.  (Docket No. 109-1 ¶ 62; Docket No. 120 ¶ 62; Docket No. 120-11; Docket No. 146-19 at 24-25.)  E.V. was given a disciplinary action because of the incident.  (Docket No. 109-1 ¶ 65; Docket No. 120 ¶ 65; Docket No. 120-11; Docket No. 146-20.)

On November 13, 2008, O.C. was given a Performance Coaching Notice.  (Docket No. 109-1 ¶ 67; Docket No. 120 ¶¶ 66-67; Docket No. 146-21; Docket No. 121-2.)  In February 2009, O.C. was transferred from the Guaynabo Amigo store to the Caparra Amigo store.  (Docket No. 109-1 ¶ 66; Docket No. 120 ¶ 66; Docket No. 109-18 at 12 ¶ 9(e)(4).)  On April 17, 2009, O.C. was given another Performance Coaching Notice, this time for not following the proper procedure for obtaining cash advances.  (Docket No. 109-1 ¶ 68; Docket No. 120 ¶¶ 66, 68; Docket No. 146-22; Docket No. 121-19.)  On December 7, 2009, O.C. received a memo for his performance and on February 22, 1020 he was terminated. (Docket No. 109-1 ¶ 69; Docket No. 120 ¶¶ 66, 69; Docket No. 146-23; Docket No. 121-3; Docket No. 109-18 at 26 ¶ 18; Docket 109-23 at 5 ¶ 20.)  None of the violations for which O.C. was disciplined was related to the consumption of alcohol.  (Docket No. 109-1 ¶ 70; Docket No. 120 ¶ 70; Docket No. 146-8.)

### 8.    Positions for which Rivera applied

Between 2006 and 2009, Rivera applied for four positions that were posted, which could have represented a promotion for him. (Docket No. 120 at 33 ¶ 24; Docket No. 144-1 ¶ 24.) In or around December 2006, Rivera applied for the position of District Food Merchandiser. Nine individuals were interviewed for the position, including Rivera. The position required vast knowledge in meats and overall knowledge about Wal-Mart Supercenter's dry food and perishable operations. (Docket No. 109-1 ¶ 71; Docket No. 120 ¶ 71; Docket No. 109-29; Docket No. 109-18 at 9-10 ¶¶ 9, 9(e)(1).) Carlos Nival ("Nival") was selected for the position because of his experience, within and without Wal-Mart, managing food departments, including the meat department. Nival had worked as a meat manager in different chain stores, he had been a Regional Fresh Manager, Deli and Bakery Manager for Sam's Club, and had also worked in the conversion of a Wal-Mart store to a Supercenter. (Docket No. 109-1 ¶ 72; Docket No. 120 ¶ 72; Docket No. 109-18 at 9-10 ¶ 9(e)(1); Docket No. 146-3 at 60.)

In or around the end of 2007, Rivera applied and was interviewed for a Co-Manager position at Sam's Club. This position was posted in November 2007 and several candidates, including Rivera, were interviewed for it at the end of 2007 and beginning of 2008. None of the candidates was selected for the position at that

time.  The recruitment for that position was later frozen because
of economic reasons.  Rivera was never informed that the position
was frozen.  (Docket No. 109-1 ¶ 73; Docket No. 120 ¶ 73; Docket
No. 109-18 at 10 ¶ 9(e)(2); Docket No. 120 at 33 ¶ 25; Docket
No. 144-1 ¶ 25.)

          In or around July 2008, Rivera applied and was
interviewed for the position of General Manager of Amigo in
Altomar.  (Docket No. 109-1 ¶ 74; Docket No. 120 ¶ 74; Docket
No. 109-18 at 10-11 ¶ 9(e)(3).)  Matos, Elizabeth Rolon and Olga
Ramos were involved in the selection process.  (Docket No. 109-1
¶ 76; Docket No. 120 ¶ 76; Docket No. 109-18 at 10-11 ¶ 9(e)(3);
Docket No. 146-4 at 61-62.)  Carlos Torres ("Torres") was selected
for the position, based on his job performance and interview.
Torres was the Manager of the Amigo store in Cataño, a store which
had surpassed sales and profit goals and had received the highest
Store Track evaluation among all stores.  Store Track measures
customer service by evaluating the customer's shopping experience,
including store cleanliness, waiting time at the cash register and
product availability, among others.  During July 2008, Torres's
store also received the highest Operation Score among all stores.
The Operation Score measures key performance indicators, including
sales, accidents, associate engagement, and shrinkage, as well as
the areas evaluated by the Store Track.  (Docket No. 109-1 ¶ 75;

Docket No. 120 ¶ 75; Docket No. 109-18 at 10-11 ¶ 9(e)(3).)  Torres
is not a soldier.  (Docket No. 120 at 34 ¶ 28; Docket No. 144-1
¶ 28.)

        In or around January 2009, Rivera applied and was
interviewed for the position of Store Manager of the Amigo store in
Caparra.  Roberto Pacheco ("Pacheco") was also interviewed for the
position.  (Docket No. 109-1 ¶ 77; Docket No. 120 ¶ 77; Docket
No. 109-18 at 11-12 ¶ 9(e)(4); Docket No. 146-4 at 63,65.)  Marcos
Sierra, Elizabeth Rolon and Hector Rodriguez were involved in the
selection process.  (Docket No. 109-1 ¶ 78; Docket No. 120 ¶ 78;
Docket No. 109-18 at 11-12 ¶ 9(e)(4).)  Pacheco was selected.  He
had over thirty years of experience and had managed the Guaynabo
store for a period of almost two years, from 2005-2007.  Under
Pacheco's management, the Guaynabo store won the Store of the Year
award in 2005.  (Docket No. 109-1 ¶ 79; Docket No. 120 ¶ 79; Docket
No. 109-18 at 11-12 ¶ 9(e)(4); Docket No. 109-30; Docket No. 109-
31; Docket No. 109-23 at 8.)  After working in the Guaynabo store,
Pacheco managed the Lomas Verdes store, which in 2007, won the
Store of the Year and the Loss Control Awards.  (Docket No. 109-1
¶ 81; Docket No. 120 ¶ 81; Docket No. 109-18 at 11-12 ¶ 9(e)(4);
Docket No. 109-32.)  During the interview, Pacheco demonstrated
greater people skills and ability, was more positive, energetic and
willing to take the challenge.  Pacheco was also more pro-active in

his responses, gave more concrete and substantive examples of challenging situations he had handled as a Manager, and was more confident and better able to talk about his experiences. (Docket No. 109-1 ¶ 80; Docket No. 120 ¶ 80; Docket No. 109-18 at 11-12 ¶ 9(e)(4).)  Pacheco has a bachelor's degree in Marketing and Rivera has an associate degree in Business Administration. (Docket No. 109-1 ¶ 82; Docket No. 120 ¶ 82; Docket No. 109-30; Docket No. 146-3 at 20.)  Pacheco is not a soldier. (Docket No. 120 at 34 ¶ 28; Docket No. 144-1 ¶ 28.)

### 9.    Rivera's vacation and military leaves

At all times during his employment with Wal-Mart, Rivera was a member of the National Guard. (Docket No. 109-1 ¶ 6; Docket No. 120 ¶ 6.)  Rivera joined the Puerto Rico National Guard in August 1992.  He started as a Private First Class and after approximately a year and eight months, was promoted to Specialist E-4.  In around 1997, Rivera was promoted to Sergeant E-5, then, to the position of Staff Sergeant E-6, and finally, in January 2009, to Sergeant First Class E-7.  Because Rivera is a National Guardsman, he needs to attend periodical training and take military leaves from his employer. (Docket No. 120 at 30-31 ¶ 4; Docket No. 144-1 ¶ 4; Docket No. 120-25 ¶ (e).)

In October 2004, Rivera had to attend a military training in Oklahoma. (Docket No. 120 at 32 ¶ 17; Docket No. 144-1

¶ 17.)  The training lasted from October 11, 2004 to November 5, 2004.  (Docket No. 120 at 33 ¶ 18; Docket No. 144-1 ¶ 18; Docket No. 144-4.)  While Rivera was at his military training, another Wal-Mart employee was assigned as Store Manager for the Monserrate Avenue store.  (Docket No. 120 at 33 ¶ 20; Docket No. 144-1 ¶ 20.)  Upon Rivera's return, he was assigned to the Wal-Mart Supercenter in Manati.  (Docket No. 120 at 33 ¶ 23; Docket No. 144-1 ¶ 23.)  At no time before Rivera began his military training was he told that he would be transferred from the Monserrate Avenue store to the Supercenter in Manati.  (Docket No. 120 at 33 ¶ 22; Docket No. 144-1 ¶ 22.)

In or around 2008, the Puerto Rico National Guard went through a transformation process by which soldiers who were classified as artillerymen were reclassified as military policemen. (Docket No. 109-1 ¶ 85; Docket No. 120 ¶ 85; Docket No. 109-30; Docket No. 146-3.)  In order to become a military policeman, Rivera had to undergo a two-phase training.  (Docket No. 109-1 ¶ 86; Docket No. 120 ¶ 86; Docket No. 146-3 at 86, 120.)  Rivera had to complete those two phases of training over a period of two years, beginning in 2008.  (Docket No. 109-1 ¶ 87; Docket No. 120 ¶ 87; Docket No. 146-3 at 120.)  Rivera had the option of selecting training dates for the military police training.  (Docket No. 109-1 ¶ 88; Docket No. 120 ¶ 88; Docket No. 146-3 at 88, 129; Docket

No. 109-33.)   In its response to an order regarding the
reclassification from artillery to military police in 2008, the
National Guard stated that:  "Among the numerous class dates
available, the Soldier selects the date th[at] best suits his/her
needs and personal situation.  Civilian employers and employment
demands and/or requirements play a crucial role in the selection
process."  (Docket No. 109-1 ¶ 89; Docket No. 120 ¶ 89; Docket
No. 109-33 at 2 ¶ 4(d).)  The military police training courses
could not be taken in lieu of the annual training that National
Guardsmen undergo.  (Docket No. 120 at 38 ¶ 56; Docket No. 144-1
¶ 56.)

        In order to take vacation, Rivera was supposed to
inform his supervisor, fill out a vacation request form and request
his supervisor's signature.  (Docket No. 109-1 ¶ 92; Docket No. 120
¶ 92; Docket No. 146-7 at 93-94; Docket No. 146-27.)   On
February 8, 2008, Rivera sent an e-mail to Matos, his immediate
supervisor, identifying the week of May 24-30, 2008 and the weeks
of July 26, 2008 - August 8, 2008 for his vacations.  (Docket
No. 109-1 ¶ 90; Docket No. 120 ¶ 90; Docket No. 146-7 at 73, 80;
Docket No. 146-3 at 107; Docket No. 146-26.)  This e-mail is a
document that is requested at the beginning of the year, but does
not mean that those vacation days are approved.  (Docket No. 109-1
¶ 91; Docket No. 120 ¶ 91; Docket No. 146-7 at 91-92.)

On July 14, 2008, Rivera sent Matos an e-mail
informing him, among other things, that the next week he would be
out of the store on "serve safe training", that his military
training had been scheduled for August 12-26, 2008, that he would
leave his assistant, Miosotis, in charge of the store during that
time and that he did not need help.  (Docket No. 109-1 ¶ 94; Docket
No. 120 ¶ 94; Docket No. 146-7 at 72-73, 94-95; Docket No. 146-28.)
The vacation leave that had been requested in the February 8, 2008
e-mail, was not mentioned in the July 14, 2008 e-mail.  (Docket
No. 109-1 ¶ 95; Docket No. 120 ¶ 95; Docket No. 146-28; Docket
No. 146-3 at 108-109, 115.)

On July 21, 2008, Rivera signed a vacation request
form for the weeks of July 26, 2008 through August 8, 2008.  That
form was not signed by his immediate supervisor Matos in the space
provided for his signature.  (Docket No. 109-1 ¶ 93; Docket No. 120
¶ 93; Docket No. 146-7 at 111-12; Docket No. 146-27; Docket
No. 146-7 at 94.)

Matos did not connect the July 14, 2008 e-mail to
the February 8, 2008 e-mail which had been sent more than five
months before.  (Docket No. 109-1 ¶ 96; Docket No. 120 ¶ 96; Docket
No. 146-7 at 95.)  The fact that Matos did not know that Rivera
would be out for an entire month prevented him from taking the
necessary measures to strengthen the store, by assigning another

manager or assistant manager to the store to assume the store's leadership. (Docket No. 109-1 ¶ 100; Docket No. 120 ¶ 100; Docket No. 146-7 at 97.)  During Rivera's vacation leave, Matos learned from Miosotis that Rivera was going to be out of the store for an entire month, information which surprised him. (Docket No. 109-1 ¶ 97; Docket No. 120 ¶ 97; Docket No. 146-7 at 80, 96.)  If a Store Manager would be out of the store for an extended period of time, the situation had to be notified to the District Manager with sufficient time so that the appropriate adjustments could be made. (Docket No. 109-1 ¶ 98; Docket No. 120 ¶ 98; Docket No. 146-6 at 34.)  It is important, of course, to know who is in charge of a store when its Manager is out for a month.  (Docket No. 109-1 ¶ 99; Docket No. 120 ¶ 99; Docket No. 146-6 at 36-37.)

     During Rivera's August 2008 vacation, Matos called him and asked why he was going to be out for an entire month. (Docket No. 109-1 ¶ 101; Docket No. 120 ¶ 101; Docket No. 146-7 at 70; Docket No. 146-3 at 104, 112-113; Docket No. 120 at 34 ¶ 30; Docket No. 144-1 ¶ 30.)  Rivera explained that he was out two weeks on vacation leave and two weeks on military leave.  (Docket No. 109-1 ¶ 101; Docket No. 120 ¶ 101; Docket No. 146-7 at 70; Docket No. 146-3 at 104, 112-113.)  Matos had no issue with Rivera attending to his military obligations.  (Docket No. 109-1 ¶ 102; Docket No. 120 ¶ 102; Docket No. 146-7 at 82.)  The only

inconvenience Matos saw with the situation was that the Amigo Store that Rivera managed was going to be without a Store Manager for an entire month.  (Docket No. 109-1 ¶ 103; Docket No. 120 ¶ 103; Docket No. 146-7 at 70-71.)  Matos thought that Rivera could have arranged his vacation so that they did not coincide back-to-back with the military leave.  (Docket No. 109-1 ¶ 104; Docket No. 120 ¶ 104; Docket No. 146-7 at 82.)

Rivera's vacation ended on August 8, 2008, and his military leave commenced on August 12, 2008.  Rivera was not on any type of leave from August 9, 2008 through August 11, 2008.  (Docket No. 109-1 ¶ 105; Docket No. 120 ¶ 105; Docket No. 146-3 at 123-124.)  Rivera did not work during that short period between his vacation leave and his military leave.  (Docket No. 109-1 ¶ 106; Docket No. 120 ¶ 106; Docket No. 146-3 at 124; Docket No. 146-7 at 99.)  A "no call, no show" is when an employee does not show up to work and does not call to inform he will not be going to work. (Docket No. 109-1 ¶ 107; Docket No. 120 ¶ 107; Docket No. 146-7 at 99.)  Rivera was not disciplined for scheduling his vacation immediately preceding his military leave.  (Docket No. 109-1 ¶ 108; Docket No. 120 ¶ 108; Docket No. 146-7 at 97-100; Docket No. 146-3 at 123.)

### 10.  The "National Hero" Comment

Hector Rodriguez spent thirty years as a member of the National Guard.  (Docket No. 109-1 ¶ 109; Docket No. 120 ¶ 109; Docket No. 146-6 at 16, 21-22.)  In or around June or July 2008, Rodriguez went to the Amigo store in Central Plaza to buy some personal groceries.  (Docket No. 109-1 ¶ 110; Docket No. 120 ¶ 110; Docket No. 146-6 at 28-29.)  During that visit, Rivera and Rodriguez spoke about a concern Rivera had regarding that he would be out of the store for an entire month.  (Docket No. 109-1 ¶ 110; Docket No. 120 ¶ 111; Docket No. 146-3 at 129; Docket No. 146-2 at 130-133; Docket No. 146-6 at 29.)  As part of the conversation, Rodriguez told Rivera that, depending on Rivera's final decision regarding his concern, he could be considered "a national hero". (Docket No. 109-1 ¶ 112; Docket No. 120 ¶ 112; Docket No. 146-2 at 132; Docket No. 146-6 at 29-33.)  Rodriguez's comment was a recommendation based on the concerns expressed by Rivera.  (Docket No. 109-1 ¶ 113; Docket No. 120 ¶ 113; Docket No. 146-6 at 29-31.)

Rivera notified Adaliz Morales, Wal-Mart's District People Manager, about certain comments that had been made in the past to him by Rodriguez and Matos.  (Docket No. 120 at 35 ¶ 35; Docket No. 144-1 ¶ 35.)  Gibson never said anything to Rivera that was discriminatory on the basis of Rivera's military status. (Docket No. 109-1 ¶ 114; Docket No. 120 ¶ 114; Docket No. 146-2

at 223.)  According to Wal-Mart's Open Door Policy, if an employee
has any problem, he or she should talk to his or her supervisor
without fear of reprisals but, if the supervisor is the person that
originated the problem, the employee may turn to any level in
management.  The policy also states: "Any retaliation or reprisal
that you suffer from any Supervision Associate may result in
disciplinary action and even employment termination."  (Docket
No. 120 at 36 ¶ 38; Docket No. 144-1 ¶ 38.)

        In September 2009, Wal-Mart was recognized with the
Above and Beyond Award given by the Employer Support of the Guard
and Reserve ("ESGR").  (Docket No. 109-1 ¶ 9; Docket No. 120 ¶ 9.)
The Above and Beyond Award is given to employers that have policies
that support soldiers and go above and beyond what the law expects
them to do.  (Docket No. 109-1 ¶ 10; Docket No. 120 ¶ 10.)

   **11.  Other allegations regarding discrimination**

      **a.  Incentive Bonus Payment**

        Wal-Mart has a Management Associate Incentive
Program which provides for a bonus based on performance.  (Docket
No. 109-1 ¶ 115; Docket No. 120 ¶ 115; Docket No. 146-2 at 172-73;
Docket No. 109-37 at 5.)  In March 2008, Rivera was paid an
incentive bonus.  (Docket No. 109-1 ¶ 119; Docket No. 120 ¶ 119;
Docket No. 146-2 at 169-172.)  Rivera's bonus was reduced from
$32,000.00 to $28,000.00.  (Docket No. 120 at 34 ¶ 29; Docket

No. 144-1 ¶ 29.)   The Management Associate Incentive Program,
effective February 1, 2007, provides that "[a]ssociates on unpaid
Leave of Absence or Long Term Disability are not eligible to
participate in the Incentive Program while on unpaid leave but are
eligible to receive a prorated Award based on the total number of
active days worked during the Program Year".  (Docket No. 109-1
¶ 117; Docket No. 120 ¶ 117; Docket No. 109-37 at 5.)   The time
Rivera spent on unpaid military leave was excluded for purposes of
that bonus.  (Docket No. 109-1 ¶ 120; Docket No. 120 ¶ 120; Docket
No. 146-30 at 31, 35-36, 43-44; Docket No. 146-29 at 6; Docket
No. 109-37 at 5.)

           b.    **The March 2009 Human Resources Meeting**

                As a Manager of a Supermercado Amigo store,
Rivera was required to attend meetings and seminars.  (Docket
No. 120 at 36 ¶ 40; Docket No. 144-1 ¶ 40.)  Rivera was invited by
Human Resources to a meeting on March 26, 2009.  (Docket No. 109-1
¶ 121; Docket No. 120 ¶ 121; Docket No. 146-7 at 88-89; Docket
No. 109-23 at 4 ¶ 13 (a).)  Rivera was initially unable to attend
because there was no one who could cover for him at the store.
(Docket No. 109-1 ¶ 122; Docket No. 120 ¶ 122; Docket No. 146-31
at 33-34; Docket No. 146-7 at 88-89.)  Anabel Piñero called Matos
to see if there was anything else that could be done to facilitate
Rivera's attendance.  After making some calls, Matos was able to

find someone from another District to cover for Rivera so that he could participate in the meeting. (Docket No. 109-1 ¶ 123; Docket No. 120 ¶ 123; Docket No. 146-7 at 89-90; Docket 146-2 at 174-175; Docket No. 146-31 at 34.) Rivera was relieved at the Store and was then able to attend the Human Resources meeting. (Docket No. 109-1 ¶ 124; Docket No. 120 ¶ 124; Docket No. 146-2 at 175; Docket No. 146-31 at 32.)

      c.    **The Sam Walton Institute Seminar**

        The Sam Walton Institute is a seminar offered to managers about the Sam Walton family and the Company's culture. (Docket No. 109-1 ¶ 126; Docket No. 120 ¶ 126; Docket No. 146-31 at 35; Docket No. 146-7 at 110; Docket No. 146-6 at 10; Docket No. 146-10 at 46.) It is an intensive class of one week duration where managers are taught new skills in organization, communication, learning, problem solution and shared leadership. (Docket No. 120 at 36 ¶ 42; Docket No. 144-1 ¶ 42.) Not all managers attend the Sam Walton Institute seminar at the same time or during the same year. The spaces for the seminar are limited and attendance depends on space availability and the manager's ability to attend, depending on specific circumstances, and whether there is someone to cover for the manager while he or she attends the seminar. (Docket No. 109-1 ¶ 127; Docket No. 120 ¶ 127; Docket No. 109-23 at 4 ¶ 13(a).) Not attending the Sam Walton Institute

Seminar does not affect the potential for growth in the company, or the employee's salary.  (Docket No. 109-1 ¶ 128; Docket No. 120 ¶ 128; Docket No. 146-10 at 46-47.)

In or around 2004 or beginning of 2005, Rivera attended the Sam Walton Institute Seminar.  (Docket No. 109-1 ¶ 129; Docket No. 120 ¶ 129; Docket No. 146-3 at 31.)  In sixteen years of employment with Wal-Mart, Rosana Melendez has attended the Sam Walton Institute Seminar only once.  (Docket No. 109-1 ¶ 130; Docket No. 120 ¶ 130; Docket No. 146-10 at 47.)  Hector Rodriguez has attended the Sam Walton Institute Seminar only once.  (Docket No. 109-1 ¶ 131; Docket No. 120 ¶ 131; Docket No. 146-6 at 10.)  Anabel Piñero has attended the Sam Walton Institute Seminar only once.  (Docket No. 109-1 ¶ 132; Docket No. 120 ¶ 132; Docket No. 146-31 at 37.)

### d.    The June 2009 payment

Plaintiff was on military leave from June 13 through June 27, 2009.  During that time, Rivera received payment from the National Guard that was higher than the salary he received from Wal-Mart.  Rivera did not receive payment from Wal-Mart for the two weeks he was out on military leave.  (Docket No. 109-1 ¶ 133; Docket No. 120 ¶ 133; Docket No. 109-18 at 19 ¶ 13(d).)  By mistake, on June 19, 2009, Rivera did not receive payment for one of the weeks he had worked prior to his military leave.  Wal-Mart

then paid Rivera for that week during the next pay period.  (Docket

No. 109-1 ¶ 134; Docket No. 120 ¶ 134; Docket No. 146-2 at 178-179;

Docket No. 109-18 at 19 ¶ 13(d).)

## II.  LEGAL ANALYSIS

### A.  Summary Judgment Standard

The Court's discretion to grant summary judgment is

governed by Rule 56 of the Federal Rules of Civil Procedure.  The

rule states, in pertinent part, that the court may grant summary

judgment only if "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as

a matter of law."  Fed.R.Civ.P. 56(c); See also Santiago Ramos v.

Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000).

The party moving for summary judgment bears the burden of showing

the absence of a genuine issue of material fact.  See Celotex Corp.

v. Catrett, 477 U.S. 317, 323 (1986).

Once a properly supported motion has been presented, the

opposing party has the burden of demonstrating that a trial-worthy

issue exists that would warrant the Court's denial of the motion

for summary judgment.  For issues where the opposing party bears

the ultimate burden of proof, that party cannot merely rely on the

absence of competent evidence, but must affirmatively point to

specific facts that demonstrate the existence of an authentic dispute. See Suarez v. Pueblo Int'l., Inc., 229 F.3d 49, 53 (1st Cir. 2000).

In order for a factual controversy to prevent summary judgment, the contested facts must be "material" and the dispute must be "genuine."  Material means that a contested fact has the potential to change the outcome of the suit under governing law. The issue is genuine when a reasonable jury could return a verdict for the nonmoving party based on the evidence.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  It is well-settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment.  Id. at 252.  It is therefore necessary that "a party opposing summary judgment must present definite, competent evidence to rebut the motion."  Maldonado Denis v. Castillo Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994).  In making this assessment, the Court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging in all reasonable inferences in that party's favor."  Griggs Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  The non-movant cannot limit his or her role to pointing to facts in controversy, but must also present adequate evidence substantiating each fundamental component of his or her claim.  That is, a plaintiff must have available sufficient

evidence for a reasonable fact-finder to conclude that he or she has met his or her burden of persuasion regarding all the essential elements of his or her cause of action.  See Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 168 (1st Cir. 1998); Fennell v. First Step Designs, Ltd., 83 F.3d 526, 535 (1st Cir. 1996) (citing Celotex, 477 U.S. at 317, 322.)

        Summary judgment is appropriate even when elusive concepts like motive or intent are in play if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.  See Feliciano de la Cruz v. El Conquistador Resort and Country Club, 218 F.3d 1, 5 (1st Cir. 2000).  It may also be appropriate even in cases involving discriminatory animus when the evidence of motive adduced by the party opposing the motion hinges on unsupported conjectures.  See Vazquez v. Lopez Rosario, 134 F.3d 28, 36 (1st Cir. 1998).  The non-moving party's failure to advance proof of the essential elements to establish his or her cause of action, and on which he or she has the burden of proof, warrants the dismissal of the case through summary judgment.  In such a situation, "there can be 'no genuine issue as to any material fact,' because a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial."  Celotex, 477 U.S. at 322-323.

In evaluating a motion for summary judgment, the Court cannot make credibility determinations, weigh the evidence, or make legitimate inferences from the facts, because they are jury functions, not those of a judge.  See Anderson, 477 U.S. at 255.

**B.   Discussion**

USERRA prohibits employment discrimination against individuals based upon their service in the uniformed services. 38 U.S.C. §§ 4301-4335.  It provides that a member of the Armed Services "shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership." 38 U.S.C. § 4331(a). The purpose of USERRA is not to protect employees from tortious acts of employers, but to prevent and to compensate service members for employment discrimination based on military status. See Gordon v. Wawa Inc., 388 F.3d 78, 84-85 (3rd Cir. 2004).  Law 62 is the Puerto Rico law counterpart to USERRA.  Its purpose is, as USERRA, to protect the members of the military forces in Puerto Rico from being dismissed or discriminated against because of their military status.  See Barreto v. ITT World Directories, Inc., 62 F.Supp.2d 387, 388, 393 (D.P.R. 1999).

For a plaintiff to establish a claim under USERRA, he or she must show that his or her military status was the "motivating factor" in his or her employer's discriminatory action, see Baerga

Castro v. Wyeth Pharm., Inc., No. 08-1014, 2009 WL 2871148, at *10
(D.P.R. Sept. 3, 2009), even if the employee's military status was
not the sole factor in the employer's decision.  See O'Neil v.
Putnam Retail Mgmt., LLP, 407 F.Supp.2d 310, 316 (D.Mass. 2005)
(citing Hills v. Michelin N. Am., Inc., 252 F.3d 307, 312 (4th Cir.
2001)).  If the plaintiff establishes that his or her military
status was a motivating factor in the employer's decision, the
burden of proof then shifts to the employer, which will avoid
liability only if the employer can prove that the action would have
been taken in the absence of the employee's military status.  See
Velazquez Garcia v. Horizon Lines of P.R., Inc., 473 F.3d 11, 16
(1st Cir. 2007).

        Discriminatory motivation because of military status may
be inferred from a variety of factors, including "proximity in time
between the employer's military activity and the adverse employment
action, inconsistencies between the proffered reason and other
actions of the employer, an employer's expressed hostility towards
members protected by the statute together with knowledge of the
employee's military activity, and disparate treatment of certain
employees compared to other employees with similar work records or
offenses." Conners v. Billerica Police Dept., 679 F.Supp. 2d 218,
226 (D.Mass. 2010) (citing Sheehan v. Dept. of the Navy, 240 F.3d
1009, 1014 (Fed. Cir. 2001)).  Proximity in time is not an

exclusive test, and there is no reason for a court to limit itself to looking only at the proximity of the adverse employment action to military activity.  See Velazquez, 473 F.3d at 19.  A plaintiff claiming discrimination "may not prevail simply by asserting an inequity and tacking on the self-serving conclusion that the defendant was motivated by a discriminatory animus."  Coyne v. City of Somerville, 972 F.2d 440, 444 (1st Cir. 1992) (citing Correa Martinez v. Arrillaga Belendez, 903 F.2d 49, 53 (1st Cir. 1990)).

        In order to establish a claim under USERRA, Rivera must show that Wal-Mart "relied on, took into account, considered or conditioned the termination of his employment" to the fact that Rivera is a soldier, see Barreto, 62 F.Supp.2d at 391, and whether Rivera's military service was the "motivating or substantial factor" on which Wal-Mart based its alleged improper actions.  See Velazquez, 473 F.3d at 11, 17.  If Rivera can make this showing, the burden then shifts to Wal-Mart to "prove, by a preponderance of the evidence, that the action would have been taken despite the protected status."  See Velazquez, 473 F.3d at 17.  The issue under USERRA is not whether an employer is "entitled" to dismiss an employee for a particular reason, but whether it would have done so if the employee were not in the military.  See Velazquez 473 F.3d at 20.

Wal-Mart avers that its decision to terminate Rivera had nothing to do with his military status and that the sole reason behind his termination was his violation of Wal-Mart's zero-tolerance Alcohol and Drug Abuse Policy.  Wal-Mart has shown this through its Alcohol and Drug Abuse Policy, Rivera's own deposition and Gibson's deposition (Docket No. 109-1 ¶¶ 13, 15-16, 20-30.) Rivera alleges that he did not violate such policy, because when he drank the Cointreau, he was not on company business, and implies that the Cointreau incident was just a pretext Wal-Mart used to cover up their discrimination because of his military status. (Docket No. 120 ¶¶ 22, 27-28,44, 51, 53-58.)

Rivera presents several arguments in favor of his position, but ultimately fails to demonstrate the existence of a genuine issue of material fact that would allow his USERRA claim to survive summary judgment.  (Docket No. 118 at 21-22 ¶¶ 1-8.) Having examined the evidence submitted at this stage of the proceedings, Rivera has not shown that Wal-Mart "relied on, took into account, considered or conditioned the termination of his employment" to his military status.  See Barreto, 62 F.Supp.2d at 391.  Furthermore, Wal-Mart has not only established that the violation of its Alcohol and Drug Abuse Policy is a "fireable offense", but also that it would have terminated Rivera regardless of his military status.  See Velazquez, 473 F.3d at 20.

It is uncontested that Wal-Mart has a zero-tolerance Alcohol and Drug Abuse Policy, that its violation results in termination, that Rivera knew about the policy and that Rivera ordered and drank a Cointreau while at lunch after a company training and before a company meeting.  It is also uncontested that on the date of the Cointreau incident, Rivera was wearing Wal-Mart's uniform, traveling in a company van driven by his District Manager, accompanied by other Wal-Mart Store Managers, and that the lunch in question occurred after a company training and before a company meeting.  (Docket No. 109-1 ¶¶ 11-13, 15-16, 21-22, 26, 28-35; Docket No. 120 ¶¶ 11-13, 15-16, 21-22, 26, 28-35.)  While it is true that Wal-Mart knew that Rivera is a National Guardsman, Rivera has set forth no facts that could lead the Court to conclude that Wal-Mart's decision regarding his termination was taken because of his military status.  Rivera has not affirmatively pointed to specific facts that could lead the Court to conclude that his termination was motivated by discrimination on the basis of his military status.  On the contrary, what the record shows is that Rivera's termination was based on his violation of the company's strict Alcohol and Drug Abuse Policy.  As discussed below, each of Rivera's arguments fails to show that a trial-worthy issue exists or that there is an authentic dispute as to these matters.  See Suarez, 229 F.3d 53 (1st Cir. 2000).

### 1.   Discriminatory comments

As one of his arguments in support of the alleged discrimination, Rivera first points to discriminatory comments made by Hector Fuentes and Hector Rodriguez regarding his status as a soldier as evidence of Wal-Mart's discriminatory animus. (Docket No. 118 at 21 ¶¶ 3(a)-3(c); Docket No. 120 at 31 ¶¶ 8-9.)  Wal-Mart contends that these comments cannot be considered by the Court because they are inadmissible hearsay. (Docket No. 144-1 at 3 ¶¶ 8-9.)   Rule 801(c) of the Federal Rules of Evidence defines hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."  <u>Keisling v. SER-Jobs for Progress, Inc.</u>, 19 F.3d 755, 762 (1st Cir. 1994).  Hearsay evidence offered in support of a motion for summary judgment is subject to the same prohibitions and restrictions as that introduced at trial. While "[h]earsay evidence, inadmissible at trial, cannot be considered on a motion for summary judgment", Fed.R.Evid. 801; <u>S.E.C. v. Ficken</u>, 546 F.3d. 45, 53 (1st Cir. 2008), the fact is that Rivera offers these comments not to prove the truth of the matter asserted but as evidence to show discriminatory animus. Therefore, these comments would be admissible because they are not hearsay within the meaning of Rule 801.  The comments, however, do not have a decisive weight on the issue before the Court.

In order for these comments to be evidence of discrimination, they would need to be related to the adverse employment action and related to Rivera's termination. See Lehman v. Prudential Ins. Co. of Am., 74 F.3d 323 (1st Cir. 1996). Neither Hector Fuentes nor Hector Rodriguez had any participation in Rivera's termination. In fact, during the discussion about the Cointreau incident, Hector Rodriguez even brought up other alternatives other than termination. (Docket No. 109-1 ¶ 49; Docket No. 120 ¶ 49.) These comments, if made, would constitute nothing more than stray remarks, and they would be insufficient to block summary judgment. See Bennett v. Saint Gobain Corp., 507 F.3d 23, 28-29 (1st Cir. 2007) (citing Ramirez Rodriguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 84 (1st Cir. 2005) (holding stray remarks by non-decisionmakers insufficient to prove pretext).

### 2.   The Carlos Matos call

Rivera next points to a call Carlos Matos made to him in August 2008, while on vacation, and right before he would begin a military training, as additional evidence of Wal-Mart's discriminatory animus. (Docket No. 118 at 21 ¶ 3(d).) It is uncontested, however, that even when Rivera sent an e-mail requesting vacation for August 2008, in order for him to take such vacation, he was supposed to inform his supervisor, fill out a

vacation request form and request or obtain his supervisor's
signature. The record shows that Rivera filled out the two-week
vacation request form, but failed to request or obtain his
supervisor's signature. Rivera then notified Matos of his two-week
military training, also for August 2008. Thus, even though Matos
knew about Rivera's two-week military leave, he had no previous
notice of Rivera's vacation or of him being out of his store for an
entire month.

Matos had no issue with Rivera attending his
military obligations, but called Rivera when he found out that
Rivera was going to be out of his store for a month because of his
two-week vacation back-to-back with his two-week military leave.
(Docket No. 109-1 ¶¶ 90-95, 97-104; Docket No. 120 ¶¶ 90-95, 97-
104.) Thus, Matos' phone call reveals no discriminatory animus but
rather, a reasonable inquiry about an unannounced one-month
absence. Furthermore, Rivera does not point to any disciplinary
action taken against him for the one-month absence in 2008, nor
does he identify Matos as one of the decision makers in his
eventual termination in 2009.

### 3.    The Transfer

Rivera additionally argues that because of his
military status, he suffered an adverse employment action when in
2004, he was removed from the position of Store Manager in the

Civil No. 09-1787 (FAB)                                          46

Monserrate Avenue Store and was assigned an Assistant Manager position in the Manati Supercenter Store, while he was participating in a military training in Arkansas. (Docket No. 118 at 22 ¶ 4.)  The summary judgment record, however, points to the contrary.  Wal-Mart has presented the Personnel Transfer Form which shows that even though Rivera was assigned for training to the Manati Supercenter, he maintained his Manager position until his transfer to the Amigo Store in Cupey in March 2005.  Rivera has failed to provide any evidence to establish that the transfer was an adverse employment action motivated by discriminatory animus. (Docket No. 144-1 ¶¶ 21-22.)

    4.   **Promotions**

        Rivera's next argument relates to the alleged promotions that were denied to him.  (Docket No. 118 at 22 ¶ 5.) Again, Rivera fails to rebut Wal-Mart's assertions and has failed to prove that he was denied the promotions because of his military status.  What the record does show, however, is that all but one of the positions to which Rivera applied were given to candidates who had better qualifications.  One of the positions Rivera applied for was eventually not recruited at all.  (Docket No. 109-1 at 12-15 ¶¶ 71-84.)  Rivera has only relied on his personal conviction that he was more qualified than the other candidates chosen.  Rivera's subjective belief is insufficient.  See <u>Shorette v. Rite Aid of</u>

Maine, Inc., 155 F.3d 8, 15 (1st Cir. 1998) (An employee's
"personal opinion regarding his own job qualifications is not
sufficiently probative on the issue of pretext" in an employment
discrimination action.).   In order to survive summary judgment,
Rivera is required to "show evidence of discrimination other than
the fact of non-selection and membership in the protected class."
See Sheehan, 240 F.3d at 1015.   He has not done so.

### 5.   Complaints to Human Resources

Rivera then argues that he complained to Wal-Mart's
Human Resources department about the discriminatory remarks made by
Hector Rodriguez and Carlos Matos, that the department did not
follow the procedures for complaints and that it refused to
investigate. (Docket No. 118 at 22 ¶ 6.)  Rivera directs the Court
to his Unsworn Statement in support of this allegation and argues
that Wal-Mart did not include his grievance in the "Red Book" as
required by the procedures.   (Docket No. 120 at 35 ¶ 36.)   The
Court, nevertheless, cannot find the "Red Book" procedures to which
Rivera refers anywhere in the record.   The Court is not required to
"ferret through the record" in search of facts that may favor the
parties.   Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33 (1st
Cir. 2001).   Because Rivera's allegation is devoid of specific
references to the record, the Court will not consider it.

### 6.   Meetings Exclusion

As another attempt to prove discrimination, Rivera argues that after he filed his discrimination complaint, he was retaliated against and excluded from participating in meetings and in the Sam Walton Institute trainings.  (Docket No. 118 at 22 ¶ 5.) Again, the record contradicts Rivera's allegations.  Rivera points only to a specific Human Resources meeting on March 26, 2009.  The record reveals, however, that Rivera was indeed invited and that he eventually attended.  Although Rivera could not initially attend because there was no other employee who could cover for him, his supervisor eventually managed to find someone to fill in for him so Rivera could attend the meeting.  (Docket No. 109-1 ¶¶ 120-123.) Rivera presents no evidence to rebut these facts or to establish that he could not attend that meeting because of his military status.  Regarding the Sam Walton Institute Trainings, the record is again devoid of any reference to discrimination against Rivera because of his military status.  In fact, what the record does show is that Rivera has attended this seminar once, just like other employees who are not in the military.  (Docket No. 109-1 ¶¶ 129-132.)

### 7.   Incentive Bonus

Rivera next argues that the amount paid as his incentive bonus constitutes evidence of discrimination.  Rivera

contends that his bonus was reduced because of his military status. (Docket No. 118 at 22-23 ¶ 6.)  Wal-Mart alleges that it paid Rivera according to Wal-Mart policies.  The record supports Wal-Mart's position.  Wal-Mart has provided the Court with the Store/Club Management Associate Incentive Program and with the Leave of Absence Policy.  (Docket No. 109-1 at 20 ¶¶ 115-120.)  In both documents it is clearly stated that the days in which an employee is out on an unpaid military leave are not counted for purposes of calculating the incentive bonus.  Rivera has not presented evidence that could rebut these documents, nor has he presented evidence that his incentive bonus was reduced because of his military status and not because of those established policies.

### 8.   Disparate Treatment

Finally, Rivera argues that there are other non-military employees that have violated the same Alcohol and Drug Abuse Policy and have not been terminated.  (Docket No. 118 at 23 ¶ 8.)  He specifically points to employees S.R., E.V., and O.C. as examples of that disparate treatment.  (Docket No. 118 at 25-26 ¶¶ 3-4.)  Wal-Mart contends that it has terminated employees that have been similarly situated to Rivera, and that there is no basis for alleging disparate treatment against Rivera because of his military status.  (Docket No. 110 at 12-16 ¶¶ 1(b)-(c).)  In support of its position, Wal-Mart has provided its Answers to Interrogatory,

Supplemental/Amended Answer to Interrogatory, Rosana Melendez'
deposition, Carmen Benitez' deposition, Performance Counseling
Sheet for E.V., and Performance Counseling Sheets for O.C..
(Docket No. 109-1 ¶¶ 53-70.)  In addition to Wal-Mart's evidence,
Rivera has provided his own Unsworn Statement and Gibson's
deposition attempting to contradict Wal-Mart's assertions. (Docket
No. 120 ¶¶ 53-70.) Rivera's evidence, however, fails to provide
specific evidence showing that these other employees were indeed
similarly situated to him. See Perkins v. Brigham & Women's Hosp.,
78 F.3d 747, 751 (1st Cir. 1996) (stating that a "claim of
disparate treatment based on comparative evidence must rest on
proof that the proposed analogue is similarly situated in material
respects".)  Wal-Mart has shown that they have terminated other
employees for the same type of violation of the Alcohol and Drug
Abuse Policy, specifically in the cases of H.V., E.R., F.G., J.P.,
and G.I.. (Docket No. 109-1 ¶¶ 53-57.)  Wal-Mart's examples of
similar treatment for violation of its Alcohol and Drug Abuse
Policy have not been rebutted by Rivera.

        O.C.'s case cannot be compared to Rivera's because
O.C. did not violate the Alcohol and Drug Abuse Policy.  Not
similarly situated to Rivera, O.C. cannot be used as an example to
establish disparate treatment. As for S.R., the record shows that
even though she allegedly consumed alcoholic beverages prior to

going to work, there is no evidence that she was under the influence during work or that she consumed alcoholic beverages while at work.  Because it could not be determined whether S.R. had violated Wal-Mart's Alcohol and Drug Abuse Policy, her case is likewise not similarly situated to Rivera's and cannot be used to prove disparate treatment.  (Docket No. 109-1 ¶ 59; Docket 110 at 13-14 ¶ (c).)

E.V.'s case cannot be compared to Rivera's either. Even though E.V. consumed alcoholic beverages, Wal-Mart could not conclude that she did so while on company business.  While the Performance Coaching Form does state that she was being disciplined because of alcohol consumption, it also states that when E.V. ingested alcohol, she thought she was off duty.  E.V.'s case is distinguishable from Rivera's in the sense that the E.V. incident happened after the trainings were over, after her work schedule had ended, and during her own free time.  (Docket No. 109-1 ¶¶ 60-65.) Rivera has not presented evidence to rebut these facts.

Unlike the examples Rivera contends demonstrate disparate treatment, the incident leading to his termination occurred during work hours, while he was wearing Wal-Mart's uniform, after a business training and before a business meeting. The fact that Rivera was having lunch does not mean that he was off duty.  Rivera has failed to highlight any instance of disparate

treatment under similar circumstances where a Wal-Mart employee violated the Alcohol and Drug Abuse Policy while on work hours and was not terminated.  Because Rivera has failed to provide any such evidence, the Court finds that there is no support in the record for Rivera's contention that his termination constituted disparate treatment based on discriminatory animus.

### 9.   USERRA and Law 62 claims

Whether considered individually or as a group, Rivera's arguments do not support a claim under USERRA.  The uncontested facts in this case do not show that Rivera's military status was considered by Wal-Mart when terminating him from his employment or that his military status was the motivating factor in his termination.  Furthermore, there is no evidence to suggest that Wal-Mart's reason for terminating Rivera was a pretext to discriminate against him because of his military status.  Rather, it is evident that Rivera's dismissal was due to his violation of Wal-Mart's strict Alcohol and Drug Abuse Policy; it was therefore inevitable and would have taken place regardless of his military status and obligations.  Accordingly Rivera's claims against Wal-Mart under USERRA and Law 62 are **DISMISSED WITH PREJUDICE.**

### 10.   Law 80 claim

Law 80 addresses in detail the issue of discharges without just cause.  It provides that every employee in commerce,

industry or any other business or place of employment, who is discharged from his or her employment without good cause, shall be entitled to receive from his or her employer, in addition to the salary he or she may have earned, the salary corresponding to one month, as indemnity, and an additional progressive indemnity equivalent to one week for each year of service. P.R. Laws Ann. tit. 29, § 185a.

Law 80 also defines just cause. P.R. Laws Ann. tit. 29 § 185b.[5] Nevertheless, the Supreme Court of Puerto Rico has held that the causes listed in the law "do[ ] not intend to be, nor should [they] be, a code of conduct containing a list of clearly

---

[5]      (a) That the worker indulges in a pattern of improper or disorderly conduct.

(b) The attitude of the employee of not performing his work in an efficient manner, or of doing it belatedly and negligently or in violation of the standards of quality of the product produced or handled by the establishment.

(c) The employee's repeated violations of the reasonable rules and regulations established for the operation of the establishment, provided a written copy thereof has been opportunely furnished to the employee.

(d) Full, temporary or partial closing of the operations of the establishment.

(e) Technological or reorganization changes as well as changes of style, design or the nature of the product made or handled by the establishment, and changes in the services rendered to the public.

(f) Reductions in employment made necessary by a reduction in the anticipated or prevailing volume of production, sales or profits at the time of the discharge.

A discharge made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment shall not be considered as a discharge for good cause.

defined offenses with their corresponding penalties for each case, whether it be a reprimand, suspension, or dismissal.  This is the option of the employer who may adopt the reasonable rules and regulations he deems necessary for the good operation of the enterprise." Delgado Zayas v. Hospital Interamericano de Medicina Avanzada, 1994 P.R.-Eng. 908,890 (P.R. 1994) (citing Secretario del Trabajo v. I.T.T., 8 P.R. Offic. Trans. 564, 568 (P.R. 1979).

Law 80 does not generally permit dismissal as penalty for a first offense.  It permits a single violation or first offense as just cause, however, if the violation is so serious or potentially damaging as to endanger the order, the safety, or the efficient, proper and normal operation of the establishment.  See Id.; Delgado Zayas, 1994 P.R.-Eng. 908,890 (reiterating that Law 80 allows an employee's discharge for a single offense "provided that the circumstances of the case do not reflect arbitrariness or whim of the employer.".)

Law 80 creates the presumption that the dismissal of the employee was unjustified.  The employer must rebut that presumption.  If the employer alleges as an affirmative defense that there was just cause for a dismissal, it has the burden of proving, through a preponderance of the evidence, that the discharge was justified.  See Rivera Aquila v. K-Mart de P.R., 23 P.R. Offic. Trans. 524 (P.R. 1989).

Rivera alleges that he was unjustly terminated.  He claims disparate treatment because other Wal-Mart employees have violated Wal-mart's Alcohol and Drug Abuse Policy and have not been terminated.  He also contends that he did not repeatedly violate his employer's rules, that this was his first violation to any Wal-Mart policy and that he should have been given a "second chance". He further alleges that even though he drank the Cointreau during his lunch hour, his action is not that serious or potentially damaging as to endanger the order, safety, efficiency and the proper and normal operation of Wal-Mart.  (Docket 118 at 28-29.) The Court disagrees.

It is uncontested:  (1) that at the time of Rivera's termination, Wal-Mart had a clear, strict, zero-tolerance Alcohol and Drug Abuse Policy in place which provided for termination in case of <u>any</u> violation; (2) that Rivera was aware of the policy and that the penalty for its violation was immediate termination; (3) that Rivera ordered and drank a Cointreau while at lunch after a company training and before a company meeting; and (4) that on the date of the Cointreau incident, Rivera was wearing Wal-Mart's uniform, traveling in a company van driven by his District Manager and accompanied by other Wal-Mart Store Managers.

Rivera's action was clearly in violation of Wal-Mart's zero-tolerance policy against the use of alcohol; the

violation, by a manager no less, certainly affects the company's order, safety, efficiency and its proper and normal operation. When Rivera drank the Cointreau, he was uniformed, on business hours, accompanied by his peers and had a business meeting in the afternoon.  As a manager, Rivera was called upon to insure that those employees who reported to him complied with Wal-Mart's Alcohol and Drug Abuse Policy and was also expected to set an example.  It would have been unwise for Wal-Mart to allow Rivera a "second chance" and not to take immediate action as specified in its policy.  In terminating Rivera, Wal-Mart was enforcing its clear, zero-tolerance policy and discouraging any future improper conduct.  Accordingly, the Court concludes that Rivera's termination because of his Alcohol and Drug Abuse Policy violation was justified.  Rivera's Law 80 claim against Wal-Mart is **DISMISSED WITH PREJUDICE.**

### 11.  Puerto Rico Constitution claim

Wal-Mart argues that Rivera lacks a cause of action under the Constitution of Puerto Rico because no state action is involved and because plaintiffs have failed to allege independent facts that could constitute a colorable constitutional claim. (Docket No. 110 at 29 ¶ D.)  Rivera's opposition has not addressed Wal-Mart's contention.  (Docket Nos. 118, 119 & 120.)

The Court has already dismissed Rivera's claim regarding Wal-Mart's alleged violation of his intimacy or privacy rights under the Puerto Rico Constitution.  (Docket No. 175.)  At that time, however, based only on the specific acts alleged in the complaint, and taking in account the motion to dismiss standard, the Court denied Wal-Mart's motion to dismiss regarding its alleged violation of Rivera's dignity rights under the Puerto Rico Constitution.  Id.  Having now additional information and evidence provided by both parties at this summary judgment stage, and taking in account Wal-Mart's motion for reconsideration, (Docket No. 176), Rivera's opposition, (Docket No. 177), and Wal-Mart's reply, (Docket No. 180), the Court finds that summary judgment in Wal-Mart's favor is also warranted as to Rivera's dignity claim pursuant to Puerto Rico Constitution.

Article II Section 1 of the Puerto Rico Constitution (the Bill of Rights) states:  "The dignity of the human being is inviolable.  All men are equal before the law.  No discrimination shall be made on account of race, color, sex, birth, social origin or condition, or political or religious ideas."  "Sec. 1 . . . of Art. II of the Constitution of the Commonwealth of Puerto Rico [is] self executing."  Figueroa Ferrer v. E.L.A., 7 P.R. Offic. Trans. 278 (P.R. 1978).

Civil No. 09-1787 (FAB)                                            58

The right to employment has been repeatedly recognized by the Puerto Rico Supreme Court as a fundamental right and part of the right to dignity protected under the Puerto Rico Constitution. Arroyo v. Rattan Specialties, 17 P.R. Offic. Trans. 43 (P.R. 1986). But, as other fundamental rights, this right is not absolute, Perez v. Junta Dental, 16 P.R. Offic. Trans. 269 (P.R. 1985), and in the case of a private employer, Law 80 provides for justified employment termination under certain circumstances. P.R. Laws Ann. tit. 29, § 185b.

Rivera has provided no evidence whatsoever to support his Constitutional claim against Wal-Mart, other than alleging that by unjustly terminating him because of allegedly discriminatory reasons, Wal-Mart violated his dignity. As the Court has explained above, the record is devoid of any evidence that could lead the Court to conclude that Wal-Mart discriminated against Rivera because of his military status, that it unjustly terminated Rivera or that it violated Rivera's dignity rights under the Puerto Rico Constitution. What the record does show is that Rivera's dismissal was the direct result of his violation of Wal-Mart's zero-tolerance Alcohol and Drug Abuse Policy. Therefore, the Court **DISMISSES WITH PREJUDICE** all Rivera's claims against Wal-Mart pursuant to the Puerto Rico Constitution.

**III. CONCLUSION**

Civil No. 09-1787 (FAB)                                                    59

For the reasons explained above, the Court **GRANTS** Wal-Mart's motion for summary judgment.  (Docket No. 109.)  All Rivera's claims against Wal-Mart under USERRA, Law 62, Law 80 and the Puerto Rico Constitution are hereby **DISMISSED WITH PREJUDICE.**

Wal-Mart's motion for reconsideration at Docket No. 176, Rivera's opposition at Docket No. 177 and Wal-Mart's reply at Docket No. 180 are rendered **MOOT.**

Judgment shall be entered accordingly.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, April 27, 2011.

                              s/ Francisco A. Besosa
                              FRANCISCO A. BESOSA
                              UNITED STATES DISTRICT JUDGE